Sedgwick, J.
The defendant became sheriff in 1871. Some time before January 1, 1871, James O’Brien, the late sheriff, through McKnight, one of his deputies, seized a stock of goods belonging to Sanger & Co., in their store in Broome-street, under an attachment against them, and remained in possession down to February 34, 1871. The attachment was in the sum of three thousand dollars.
On January 13, 1871, two executions were issued to the defendant. These were in the aggregate for nine thousand eight hundred and fifty-four dollars and forty-eight cents. On that day the defendant’s deputy, one Schmitz, went to the store in Broome-street for the purpose of levying under these executions. He was informed by or in behalf of McKnight that the latter had possession of all the goods by virtue of the attachment. The defendant’s deputy, Schmitz, did not take or attempt to take any possession or control of any goods, but made what he called an informal levy upon the surplus, if any, that might be left after satisfaction of the attachment. He asked McKnight to allow him to take possession, but McKnight refused.
On January IS, 1871, defendant’s deputy, Schmitz, put a new man, named Pearsall, on guard over the .;tore, but not in it, for the purpose of taking actual possession if the late sheriff’s deputy, McKnight,. should abandon his levy under the attachment.
On January 14, 1871, McKnight removed goods from the store of the value of five thousand and forty-nine dollars and sixty-four cents. The defendant’s deputy, Schmitz, was informed by his man Pearsall that McKnight had taken goods. He was not informed of the value of these goods, or of the place to which *90 they had been taken. He received this information before February 24, 1871. They had been taken to a place for storage in this county. On February 1, 1871, the. plaintiff duly took out an execution against the property of E. P. Sanger & Co., for the sum of four hundred and nine dollars and thirty-three cents. This was placed, to be levied, in the hands of defendant’s deputy, Schmitz, on the same day.
Nothing occurred before February 23, 1871, to prevent the deputy, Schmitz, from doing his whole duty to the plaintiff under his execution. He was bound to use reasonable and ordinary efforts to find property on which he might levy, that would as far as possible pay the three executions referred to. Until February 1, 1871, when plaintiff’s execution was placed in his hands, the plaintiff in the prior executions could alone call him to account, but on February 1, and from that to at least February 23, the plaintiff here had a right to his diligence in endeavoring to levy sufficient under the executions in his hands, to secure the three. He knew of the goods in Broome-street. They were at least of the value of eight thousand three hundred and thirty-nine dollars and twenty-five cents. He had heard that McKnight had taken under the attachment in his hands goods from the store. This case, I think, turns upon the conduct in respect of these goods. If he used ordinary diligence and reasonable effort to discover where they had gone, the defendant is not responsible for any consequence that came from his- not having known concerning them. If the performance of his duty would have made known to him where the goods were or what they were, and if then a use of ordinary means would have enabled him to make a levy that would have secured the plaintiff’s execution, the defendant is liable to respond to the plaintiff for the levy not having been made.
If the goods, both in Broome-street and on storage, *91 were held regularly and in compliance with. law under the attachment, the defendant’s deputy had no power to seize or take possession of them, or any part of them. The deputy holding the attachment had a right to execute the process, so as to take or keep possession of enough goods to secure the payment of three thousand dollars. Ho question was made as to the amount of fees under this attachment. Ho demand seems to have been made for them out of the property when it went into the bankruptcy court.
What did defendant’s deputy, Schmitz, do to discover the property that had been taken away from the store? He first asked deputy McKnight’s assistant where the goods had been taken to. This assistant told him to ask McKnight. McKnight was asked, but refused to tell him. He also asked one of the firm of Sanger & Co., who professed to know not, and also the present plaintiff’s attorney, who, of course, did not know.
What might he have done without extraordinary vigilance, but in the ordinary mode of getting knowledge used by sheriff’s officers? He might have asked his man Pearsall what his sources of information were, and, in this way, gone back as far as possible to the facts. He might have made ordinary inquiries for persons or carts likely to take away that large amount of goods. He might have made inquiries at places where they would likely be left during the pendency of the attachment. On receiving the answer he did from McKnight, it would have been, I think, an ordinary step for him to go to the sheriff, O’Brien himself, and to call for the exercise of authority over McKnight. He knew, or might have known, that the goods in the store, were more than sufficient levy under the attachment, and he could not, therefore, content himself with the presumption that the other goods had been taken away duly, in obedience to the commands of the *92 attachment. That fact, in connection with an unnecessary and evident concealment by McKnight, was sufficient to apprise him that they were goods which should be applied to the execution. I think that if he had used the diligence required of him (Hinmain v. Borden, 10 Wend. 367; Tomlinson v. Rowe, Hill & D. Sup. 410), he would have learned the place where the property taken away was and what its value was.
There would then have been, to his knowledge, property of E. P. Sanger & Co. in this county of the value-of thirteen thousand three hundred and eighty-eight dollars and eighty-nine cents ($13,388 89). It is clear that deputy McKnight had no legal right to hol'd all this property under the attachment. He could lawfully hold only so much as would be sufficient to satisfy the attachment-plaintiff’s demand.
There is some reason for believing—that is, if we rely on Schmitz’s testimony—that the attachment was levied and used in the interest of E. P. Sanger & Co. to the knowledge of Algeo. The testimony is that McKnight gave up possession under the attachment as soon as the injunction in bankruptcy was served, viz. February 25, 1873. But it had not been then determined that E. P. Sanger & Co. were bankrupts. If McKnight was bona fide attempting to protect Algeo’s interest, it is most likely that possession would have been maintained until the adjudication in March. But the proof is not sufficiently strong perhaps to show that Algeo was a party to such a use of the process as to require us to decide that Deputy Schmitz should have disregarded it.
But as it was manifest to deputy Schmitz that McKnight was making an excessive levy under the attachment, his duty to the executions he held required that he should take ordinary measures to have such parts of the property as were not properly attached relieved, so that he might levy. The least he could have done was to make a specific demand of McKnight that he *93 should release whatever was in the store that was not necessary to secure the attachment, and, in case of a non-compliance by McKnight, to have made the same demand of sheriff O’Brien. We must deem that there would have been an obedience of law by public officers when the specific request was made. And if there had not been negligence in reference to the goods taken from the store, the executions might have been levied upon them also.
There would have been enough value to have fully paid the claim, in the attachment suits and the three executions, including the present plaintiff’s.
We have left out of view that part of one of the prior executions as to which the defendant returned nulla bona. There is authority for saying that the return binds him in this action, and that he can not contradict it, for the purpose of maintaining that the prior executions would have exhausted the leviable property of E. P. Sanger & Co. before plaintiff’s execution could have been reached (Patton v. Westervelt, 2 Duer, 362). On February 24, 1871, an injunction was issued out of the bankruptcy court restraining all persons having property and goods of E. P. Sanger & Co. from parting with them. This was some time before they were declared bankrupts. As we have seen, on that day McKnight gave possession of the goods in the store to defendant’s deputy, and the latter went into possession about March 11, 1871. The marshal serving the warrant in the bankruptcy proceeding claimed a right to take these goods. The defendant’ s deputy claimed to hold them only for the benefit of the two first executions. By consent and order of the bankruptcy court these goods were sold, and the various claims transferred to the proceeds. The case does not show particularly what the sheriff claimed in respect of the goods taken away by deputy McKnight. The attachment itself was dissolved by the bankruptcy *94 proceedings. I think there can be no doubt that the defendant made no claim whatever as against these-latter goods, in the bankruptcy court in behalf of the present plaintiff. If he had not been negligent, there would have been what is tantamount to a levy in behalf of the plaintiff’s execution—that is, there would have been a levy under that execution, or under some other, which would have inured to its benefit. Irrespective of the effect of the bankruptcy, the proof is, the plaintiff would have recovered the full amount of his execution, and therefore that he has been damaged in that amount.
I do not think that any consideration arising out of the bankruptcy proceedings mitigates the damages. What would have been the effect of the sheriff’s litigating in behalf of plaintiffs executions in the bankruptcy court, after notice to plaintiff of the proceeding, in case of an adjudication against the claim, does not call for-answer here, inasmuch as there was no such adjudication, and no such claim or notice. The defense then rests upon the suggestion that if the defendants had so-acted in behalf of the plaintiff that the latter had an interest in a levy, it would have resulted in no benefit to the plaintiff, because the bankruptcy court, in that very proceeding, adjudged that the assignee had a, right to the property free of the two prior executions founded on judgments declared to be in violation of the bankrupt act, and that the plaintiff’s judgment would have met a similar fate, or because this latter judgment was in violation of the bankrupt act. I think this is speculative. The two prior judgments might have been against the bankrupt act, and the plaintiff’s judgments might not have been. The late decisions of' the supreme court would uphold it. It certainly would not have been disregarded, if the assignees in bankruptcy had not seen fit to question it. It was valid, except as they might take advantage of any defect, if there *95 were one. It is not the sheriff who can make this claim for the assignees. He owes fidelity to the process issued in behalf of the plaintiff. The assignee might never have made an attempt to'mrpeach that process.
In substance, under sections 35 and 39 of the bankrupt act, the assignee has a chose in action by which “he may recover the property or the value of it from the person so receiving.it or so to be benefited,” or “ may recover back the money or other property so paid, conveyed, sold, assigned, or transferred contrary to this act; provided the person receiving such payment or conveyance had reasonable cause to believe that a fraud on this act was intended and that the debtor was insolvent.” The defendant has no right to diminish the plaintiff’s claim against him, by showing (if he could) that facts exist which would have put it in the assignee’s power to take the goods levied upon, or recover their value if the proceeds had been paid to the plaintiff. Section 35 says that the mode of getting the preference is void. That is the equivalent of language used in our own statutes against fraudulent conveyances, and means void in favor of those against whom it is considered or declared a fraud. If the assignee might have succeeded, but if he never took the necessary steps to assert his claim, the sheriff has no right to dispose of the plaintiff’s interest in property on the supposition that the assignee might have-asserted and maintained his claim.
The plaintiff should have judgment for four hundred and nine dollars and thirty-three cents and interest.
Brown, Hall & Vanderpoel, attorneys, and J. Sterling Smith and A. J. Vanderpoel, of counsel, for appellant, urged;—The plaintiff failed to show any property out of which the defendant could havecofiected the said execution, or any portion of *96 it. I. On January 12 the property was all at the Broome-street store, with the exception of twenty-five cases of hats, which were at Algeo’s shop; but on January 14, Sheriff O’Brien removed some of the goods from the Broome-street store to Bogert’s, and afterwards took them to Topping’s; and on January 25, said O’Brien removed the hats that-were at Algeo’s to Topping’s also, so that on February 1, there was no property belonging to E. P. Sanger & Co., except what was in the Broome-street store, and the property at Topping’s, all of which was in ex-Sheriff O’Brien’s custody.
II. The defendant could not have collected the plaintiff’s execution out of the property which was in the Broome-street store on February 1. There was not ■enough of it to satisfy the Tenth National Bank executions. The property was sold by Wilmerding, Hoguet & Co., and the proceeds, amounting to eight thousand two hundred and thirty-nine dollars and twenty-five cents, were paid to and held by the defendant, pursuant to an order of the bankruptcy court. The amount of the Tenth national Bank executions which the defendant held was nine thousand eight hundred and fifty-four dollars and forty-eight cents, exclusive of interest, and were prior to the plaintiff’s execution.
III. The defendamt could not have collected the plaintiff’s execution out of the property at Topping’s. The property was already in custody of the law in O’Brien’s possession, and the defendant could not levy on it. “Property once levied on, remains in custody of the law, and it is not liable to be taken by another execution in the hands of a different officer” (Hagan v. Lewis, 10 Peter U. S. 402-3; Dubois v. Harcourt, 20 Wend. 41; Van Loan v. Kline, 10 Johns. 135; Hartwell v. Bissell, 17 Id. 128; Knox v. Smith, 4 How. U. S. 298; Taylor v. Carryl, 20 Id. 583).
IV. The plaintiff may urge that, although the de *97 fendant had not the right to the possession of the property which was at Topping’s, and could not have taken and sold it; nevertheless, if he had made an informal levy on it in O'Brien’s hands, or levied upon the property subject to the right of O’Brien, he would have obtained a lien upon it, which would have followed the property into bankruptcy, and could have been asserted against the assignee in the bankruptcy court. The learned judge who tried the case seemed to have had some such idea, and to have been largely influenced by it in deciding the case. But there can be no informal levy upon property not subject to levy ; and, as we have already shown, this property being already in the custody of the law, could not be levied upon by the defendant. Nor could the defendant have levied upon the property subject to the right of O’Brien’s levy. The interest of E. P. Sanger & Co. in that property, on February 1, 1871, was a residuary interest, or the right to the surplus after O’Brien had satisfied his claim, and such an interest can not be levied upon under an execution. Under an execution only goods and chattels can be taken, and there can be no levy where the sheriff at the time of making the same has no right to proceed and sell the property. In the case of pledged property, the pledgor’s interest can now be levied on, but that is by express statutory provision, and in that case the sheriff can take the property and sell it (3 R. S. 5 ed. 645, § 20; Steif v. Hart, 1 Coms. 20).
V. The learned judge who tried the case seems to have regarded the levy of O’Brien as excessive, and to hold the defendant responsible for it. It undoubtedly was excessive after the other attachments in his hands had been withdrawn ; but O’Brien is liable for that, and not the defendant. O’Brien had a valid attachment, and the defendant had no power or authority to compel O’Brien to release to him any of the property. *98 Evidently O’Brien believed he had more property at Broome-street than was necessary to satisfy the attachment claim, for as soon as he knew defendant had received the Tenth National Bank executions he removed from Broome-street property enough to make him safe, and kept the fact concealed from the defendant. He did not, however, give up his levy on the property remaining in the Broome-street store until the petition in bankruptcy was filed, and the learned judge who-tried this case finds fault with him for giving it up as; soon as he did, and attempts to draw conclusions, unfavorable to the defendant, because O’Brien did not hold on to the said property in Broome-street tintil the bankruptcy proceedings had proceeded far enough to vacate the attachment, although O’Brien retained until that time this property at Topping’s, which was ample to protect the attachment claim. Also, if O’Brien had. at any time released all of the property which he held in excess of what was properly held under the Algeo attachment, it would have been inured, as it did, to the Tenth National Bank executions, and not to the plaintiff.
VI. The petition in bankruptcy against E. P. Sanger & Co., was filed February 24, 1871 ; they were-adjudicated bankrupts March 11; the warrant of seizure was issued to the marshal March 14 ; and the assignment was executed to the assignee April 15,. 1871. The defendant could not, therefore, have levied on any of this property after February 24, 1871, even though he had known where it was, and no injunction had been issued by the bankruptcy court restraining-him from doing so (Miller v. Bolles [N. Y. Ct. of Ap.], reported in 10 Nat. Bk. Reg. 515; Miller v. O’Brien,. 9 Id. 26). A principal inquiry in this case, therefore, becomes narrowed to the question whether or not the plaintiff has shown there was property within the city and county of New York, between February 1 (the day *99 plaintiff’s judgment was docketed and execution issued), and February 24, 1871 (the day the petition in bankruptcy was filed), from which the defendant ought, by the exercise of due and reasonable diligence, to have collected the execution.
In addition to the reasons before given the judgment below is erroneous for the additional one that the defendant did not have notice of any property out of which he could collect said execution, nor is the plaintiff now able to point out the existence of any such property. The learned judge evidently based this finding upon the idea that the property at Topping’s could have been levied on by the defendant if he had known where it was, and that knowing that property had been removed from Broome-street, he was negligent in not following it up and ascertaining where O’Brien had stored it, and what it consisted of. He does not find that defendant knew of the property at Topping’s, but that he “ had notice” of it. The question of defendant’s diligence in ascertaining what property ex-sheriff O’Brien had removed from the Broome street store was immaterial.
Brownell & Lathrop, attorneys, and S. B. Brownell, of counsel, for respondents, urged;—The defendant, Brennan, is liable to the plaintiff for the false return and neglecting to make the money upon his execution. Defendant’s neglect was Ms allowing five thousand and forty-nine dollars and sixty-four cents of the goods levied on by him on January 12, 1871, to be removed from Ms control, and suffering them to go to the marshal in bankruptcy without making any claim to them under plaintiff’s execution or notifying the plaintiff so that he could indemnify the defendant or make a claim in the bankruptcy court, and returning the plaintiff’s execution and thus preventing the plaintiff making any claim in the bankruptcy court. This neglect lost the plaintiff his execution. It is idle to
*100 say that the defendant had no notice of these goods, for he actually levied on them on January 12, 1871, and that levy enured to the benefit of the plaintiffs execution when it came to defendant’s hands without a new levy. A levy under one execution, even though it has become dormant, enures to the benefit of a subsequent execution (Peck v. Tiffany, 2 Coms. 451; Camp v. Chamberlain, 5 Den. 198: Rev. Stat. p. 3, ch. 6, tit. 5 § 1, 314, &c.). A levy under one execution enures to the benefit of a second execution subsequently coming to the same officer (Van Winkle v. Udall, 1 Hill, 559; Birdseye v. Ray, 4 Id. 159; Russell v. Gibbs, 5 Cow. 395; Cresson v. Stout, 17 Johns. 116). It is equally idle to say that he could not have made the amount of plaintiff’s execution from them, on account of the Algeo attachment, for there are two thousand and forty-seven dollars and sixty-nine cents, or five times the amount of plaintiff’s execution beyond the Algeo attachment. Lovick v. Crowder, 8 Barn. & Cress. 132, is in point. The sheriff was held liable for negligence in not asking to see the warrant under which the former sheriff claimed to hold the goods (Cited and approved, Paton v. Westervelt, 2 Duer, 386). “When he was informed that the officer of the former sheriff claimed it under a levy, it was the defendant’s duty to ask to see the warrant or execution. If he had done that, he would have seen from its date that there had been such gross delay as rendered it fraudulent and void.”
By the Court.—Curtis, J
The defense set up in the answer, that the plaintiff’s judgment and execution, were obtained and issued to procure a preference in violation of the bankrupt law of the United States, and therefore void, was in view of the recent decisions, and especially that of the United States supreme court in Wilson v. City Bank (17 Wall. 489), not pressed *101 at the argument, and it becomes unnecessary to consider it here.
The evidence shows that O’Brien, the late sheriff, by McKnight, a deputy, previous to January 1,1871, had levied upon the goods of Sanger & Go., at their store in Broome-street, under an attachment for three thousand dollars issued in a suit wherein one Algeo was plaintiff. On January 12, 1871; the defendant’s deputy, Schmitz, went to this store with the, two executions in favor of the Tenth National Bank,, amounting to nine thousand eight hundred and fifty-four dollars and forty-eight cents, to levy, and made, what he calls, an informal levy. McKnight was in possession, and refused to let him have access to the goods, or possession, or to let him make an inventory of them. Schmitz learning that the attachment case might be settled and McKnight go out, put one Pearsall on guard to notify him, so that he might then take possession.
On January 14, 1871, McKnight removed from the store goods of the value of five thousand and forty-nine dollars and sixty-four cents. Pearsall informed Schmitz of the removal. This was previous to February 24, 1871. Plaintiff’s execution was placed in Schmitz’s hands to be levied February 1, 1871. It does not appear that Schmitz was informed of the value of the goods removed, or to what place they were taken. It was his duty to use due diligence to find property to pay the three executions.
The liability of the defendant depends upon the conduct of his deputy in respect to these goods.
It was considered by the learned judge at the trial, that if the goods were held regularly and in compliance with law under the attachment, the defendant’s deputy had no power to seize or take possession of them, or any part of them. This question was fully discussed at the argument, but in the view here taken of the case it will not be necessary to consider it.
*102 It is difficult to say, that when an attachment has been levied on the property oí a defendant, a sheriff into whose charge executions come to be levied on the same defendant’s property, owes no duties to the plaintiffs in respect to their enforcement. The property may be, as is claimed, in the custody of the law, and not liable to be taken by another execution in the hands of a different officer, yet, can there .not be circumstances that call on the sheriff to exercise a reasonable care and diligence in the matter ?
For instance, in the present case, where an attachment was issued for three thousand dollars to be levied and used in the interest of E. P. Sanger & Co., with the knowledge of Algeo, as the court considered there was some reason for believing if Schmitz’s testimony was to be relied on, and where the assets of E. P. Sanger and Co. amounted to between eighty thousand dollars and ninety thousand dollars, and the sheriff’s deputy, Schmitz, holding the executions, was notified that a part of the goods claimed to be seized under the attachment, were removed in a concealed and surreptitious manner by their custodian, it is very difficult to hold that the sheriff did not owe the duty to the plaintiff of asking the watchman, Pearsall, who informed him of it, what information or knowledge he had about their removal, or of making common inquiries for persons or c.arts likely to remove that large amount of goods, or of asking to look at the warrant of attachment, or of applying to Sheriff' O’Brien himself about the removal, or of calling upon him to release from the levy of the attachment all goods beyond what was necessary to secure the payment of the three thousand dollars and sheriff’s fees.
A proper regard for the administration of justice, has always led courts to inflexibly require the exercise of diligence and fidelity in the execution of process, from all officers to whom the law confides it for execu *103 tion. Upon the officers charged with the execution of process, from the highest to the lowest, the law confers great powers, and extends to them the amplest protection consistent with the proper discharge of their important duties.
The evidence shows that the deputy Schmitz, omitted to make those inquiries in reference to the goods removed, most likely to afford him information about them. They were not taken from the city, and there does not appear to have been any substantial reason why he did not learn where they were. It is true, Schmitz testifies he asked the plaintiff’s attorney what had become of the goods, and also McKnight and his man and one of the firm of E. P. Sanger & Co. The plaintiff’s attorney, of course, did not know, and the member of the firm of Sanger & Co., and McKnight’s man, refused to answer, and referred him to McKnight, who amply satisfied the deputy’s anxiety and diligence in the matter, by declining to give him any information on the subject.
After this weak and brief investigation, the defendant’s deputy remained tranquil, communicating in no way to the plaintiff’s attorney the very suspicious features o f the transaction apparent upon its face, and and not acting himself or pushing any further inquiries, or taking any of those steps that would in the exercise of common and ordinary care and diligence have brought to his knowledge property of E. P. Sanger & Co., in this county, of the value of thirteen thousand three hundred and eighty-eight dollars and eighty-nine cents, being more than enough to pay off the attachment and the three executions, all of which amounted to thirteen thousand three hundred and sixty-three dollars and eighty-one cents, including the present plaintiff’s. There was an entire omission on the part of the defendant to give information to the plaintiff of this manifestly excessive levy, so that he might be *104 enabled to seek relief, nor did the defendant’s deputy make any demand on sheriff O’Brien, or apply even to have some part of the property relieved from the attachment.
On February 24, 1871, proceedings in bankruptcy were taken against E. P. Sanger & Co., and under these the sheriff was allowed to sell the goods levied upon in the store in Broome-street. These realized eight thousand two hundred and thirty-nine dollars and twenty-five cents. The goods that were surreptitiously removed from the store were sold for five thousand and forty-nine dollars and sixty-four cents. The attachment for the three thousand dollars was dissolved by the bankruptcy proceedings, and the two executions in favor of The Tenth National Bank were set aside by the United States circuit court as void, on the ground that the bank had reasonable cause to believe E. P. Sanger & Co. were insolvent at the time of' the levy. The' defendant returned the plaintiff’s execution unsatisfied. All the property of E. P. Sanger & Co. passed into the custody of the marshal in. bankruptcy while the defendant held the execution, yet he made no claim under it, and gave no notice to the plaintiff, so that he could indemnify the defendant, or make a claim himself in the bankruptcy court.
It is idle to speculate, as to what would have been the fate of the plaintiff’s execution and judgment under the bankruptcy proceeding. There is every reason, from the proofs and the recent decisions, to be lieve they would have been sustained, and it was for the assignee in bankruptcy, and not the defendant, to raise the objection.
Upon considering the questions raised by the defendant, it seems to be clearly settled by the adjudications-of the courts, and as absolutely necessary for the proper administration of justice, that a sheriff to whom... an execution is issued, is bound to use all reasonable- *105 endeavors to execute the process of the law, in the most effectual manner. As a mere agent he would be' required to exercise at least the ordinary diligence that persons of common prudence are accustomed to use about their own business and affairs. Voluntary ignorance, or that which arises from a neglect to make proper search or inquiries, will not excuse him. His duty is to inquire of those who would probably be' acquainted with what the due execution of his process requires him to ascertain, and when he searches, to search in localities where it was probable he might find what he was called upon to find. When he holds various executions against the same defendants, it is a breach of duty for him to lend himself to one party to the wrongful prejudice of another, or to withhold information from one party of proceedings that may wrongfully deprive him of his remedy, and he has been held liable for negligence in not asking to see the warrant under which the former sheriff claimed to hold the goods (Tomlinson v Rowe, Hill & Den. Sup. 410; Henman v. Borden, 10 Wend. 369; Phil. Ev. C. & H. notes, p. 692, ed. 1859; Warmoll v. Young, 5 Barn. & Cress. 660; Lovick v. Crowder, 8 Id. 132; Dean v. Macknamara, 5 Dowl. & Ryl. 95).
Applying these rules to the conduct of the-defendant’s deputy with the plaintiff’s execution, it is apparent that he was guilty of neglect, and that there was a failure to exercise ordinary diligence, and that by his omission to take proper steps and to make proper inquiries, and of the persons likely to know, and also by his failure to notify the plaintiff of the proceedings in bankruptcy, so that he could make his claim in the bankruptcy court, the plaintiff lost the benefit of his execution. There was that failure of diligence on the part of the defendant that entitles the plaintiff to recover against him, and the judgment appealed from should be affirmed, with costs.
*106 We think, however, there are questions of law involved, • which ought to be reviewed in the court of .appeals. We will, therefore, enter an order under Laws of 1874, ch. 322, to that effect, if desired by the appellant.